[Civ. No. 4614. Third Appellate District.—November 28, 1932.]

N. H. LONG, Respondent, v. SACRAMENTO VALLEY SUGAR COMPANY (a Corporation), Appellant.

George R. Freeman and Farrand & Slosson for Appellant.

W. T. Belieu for Respondent.

PLUMMER, J.—The plaintiff had judgment in this action based upon a complaint alleging breach of contract on the part of the defendant, in which contract it was agreed that the plaintiff should harvest for the defendant approximately 1500 acres of barley for and during the cropping season of 1930, at an agreed price of $3 per acre, the plaintiff to furnish all men and equipment for operating the harvester and thresher, the defendant to furnish sacks and twine.

The complaint sets forth that the crop for 1930 matured and was threshed; but that the plaintiff was not permitted by the defendant to harvest the crop as had been previously agreed upon. Plaintiff was awarded damages in the sum of $2,000. From this judgment the defendant appeals.

The record shows that the defendant is a corporation, and engaged in farming on a large scale in Glenn County, and had been so engaged for over twenty years prior to the year 1930. As a part of its farming operations the defendant had usually prepared, planted and harvested approximately 3,000 acres of grain annually. The plaintiff

was the owner of farming machinery and equipment prepared for plowing, harrowing, seeding, harvesting and threshing grain, and had previously to the year 1930 performed services for the defendant in plowing, harvesting, seeding and threshing grain.

The record shows that during the year 1929 the defendant had planted and harvested between 2,300 and 2,400 acres of grain, of which acreage the plaintiff harvested and threshed 1219 acres, and Henry Gianella 1171 acres. Approximately the same acreage was harvested by the plaintiff in 1928.

The record further shows that the plaintiff in 1928 and 1929 plowed, harrowed and put in the grain raised by the defendant.

 Upon this appeal it is contended that no contract was entered into; that there was lack of consideration; and also that the contract was indefinite and uncertain.

According to the rules of construction as found in the Code of Civil Procedure, sections 1641 to 1649, inclusive, the following excerpts of the testimony taken from the transcript we think sufficiently answer every contention of the appellant, and sufficiently support the verdict of the jury. A. M. Gelston, a witness called and examined on behalf of the plaintiff, testified as follows:

"Q. Are you acquainted with the defendant in this action, the Sacramento Valley Sugar Company? A. I am. Q. How long have you been acquainted with them? A. Twenty-five years. Q. Have you ever had any business identity with the Sacramento Valley Sugar Company? A. Yes. Q. How? I was in their employ for the same period. No, for twenty-four years, a little over twenty-four years I was in their employ. Q. In what capacity? A. For the first eight years I occupied the position known as cashier for the Company, then the first of January, 1914, up until I severed my relations I occupied the position of manager. Q. In what business during the last two years has the Company been engaged? A. In farming. . . . Q. During the last three years to what extent in acreage—if you want to state it—have they farmed in that vicinity? A. In 1929 I think we had in the neighborhood of twenty-three or twenty-four hundred acres. In 1930 they seeded a little over three thousand, that is, they had that growing. Part of

it was volunteer they harvested it, they harvested the volunteer growth. Q. Who carried on for the Sugar Company the farming operations? A. A farming superintendent under my control. Q. How was the work of farming or your farming operations carried on, by yourself using your own equipment and outfit or in recent years were they hired? A. In recent years we hired it done, in the more recent years. . . . Q. That crop of barley which was planted in the year 1930, did it mature? A. It did. Q. Was it harvested? A. It was. Q. By whom? A. The person working in the field was Henry Gianella. Q. Are you acquainted with N. H. Long, plaintiff in this action? A. I am. Q. How long have you known him? A. For a number of years; I don't know when I first became acquainted with him. Q. Did you have any contract relations with him or any business relations with him, with respect to the threshing of the barley acreage in the year 1930? Just answer that yes or no. A. Yes. . . . Q. What was the agreement which you had with Mr. Long with regard to threshing the barley, if any? A. That he and Mr. Gianella already referred to would together do the three thousand or more acres of threshing that we had to do. Each one to do all that his outfit, his harvester was capable of doing, and to take such field as developments might show were best adapted to the character of the different machines. Q. Was there any agreement or understanding with regard to the compensation they were to get for doing this work? A. Three dollars an acre. Q. Payable when? A. Whenever they happened to want it except the final settlement which was to be made as soon as the work was completed. Q. Did Mr. Long do this threshing? A. In 1930? . . . A. Not to my knowledge. Q. You testified Mr. Henry Gianella did the threshing? A. He was on the work, I think he did it all. I am not positive. Q. Did you have occasion during the growing and maturing season of this crop, did you have occasion to notice the kind of crop you had as to whether it was a full crop or part of a crop or a poor crop? A. It was so considered, it was considered an exceptionally good crop. . . . Q. Had you occasion to observe the condition that outfit was in in 1930, at the time you say the agreement was made? A. No, my understanding was it was a new rig. Q. That had done any threshing or had he done

any threshing for you in the preceding year, preceding that year? A. Yes. Q. What year? A. 1929. Q. Did he do all the threshing that year or did he do but a part of it? A. He did the most of it according to my recollection. I believe Mr. Gianella did some of it also; I am speaking from memory, however. . . . Q. Did you have to do with the preparation with this barley land for seeding? A. Did I have to do with it? Q. Yes. A. I had control of it. Q. You had it prepared for seeding? A. Yes. Q. Who did the preparatory work on the land? A. Mr. Long. Q. Employed by whom? A. Employed by me as representative of the Sacramento Valley Sugar Company. . . . (Cross-Examination) By Mr. Freeman: Q. In 1929, Long also did some work for you, didn't he, in harvesting? A. Yes. Q. And Gianella did? A. Yes. Q. Those are the only two that did the harvesting work in 1929? A. In 1929, yes. Q. Were there any written contracts with them for the work in 1929, for the harvesting work? A. No, not that I remember. . . . Q. In the winter of 1930, do you recollect you had some talk with both Gianella and Long about the harvesting for the then coming season, is that correct? A. Yes. Q. Where was that conversation had? A. In my office, the office of the Sugar Company. Q. Just the three of you present? A. That time there were just the three of us, at the time I finally talked with them. I had previous talks with each one of them privately. Q. When did you have this conversation in your office in February, 1930? A. That, as I recall it, was in the last part of January or first of February. I have no proof of it except my memory. Q. You say you had previous talks with each one of them separately? A. Yes, sir. Q. Do you recall when you talked with Mr. Long? A. I have no means of locating it as to time. I talked to him several times. Q. What was the gist of the talks? A. That I expected him and Henry to do the work as they had done it the last year. Q. You had more than one talk of that kind, did you? A. Yes. Q. And the substance of each and every conversation was practically the same? A. Yes. . . . As near as I can recall it he wanted to know how much each one would do or what fields they would do and the crop had not progressed at that time to a point at which I felt I could say which field was the best adapted to which machine. Gianella had a

slightly larger machine than Mr. Long had, and I told them at that time that while it was understood that they would do the work, I would have to defer until a later date before I could decide just which field would be done by which rig. Q. Was there any discussion at that time whether or not, when you did come to the conclusion as to which field each one would harvest, whether the contract would be reduced to writing? A. No, that was not considered. Q. You didn't contemplate reducing it to writing at all? A. No. . . . Q. My information was that three dollars an acre was paid in 1929. In your discussion with these two men you assumed the same price would be paid. A. Yes. Q. Was it stated? A. Yes it was. Q. Was it stated at this discussion of January or February, 1930? A. Yes. . . . Q. When, if you recall at all, did you tell Mr. McGrath or anybody else about the arrangement for harvesting? A. I did tell him but I don't know when. I have no means of saying when. Q. Whether you discussed the matter of this contract or not can you say whether or not after the meeting in February or January you ever saw Nate Long again to talk to him? A. I have seen him every day or two pretty near—to pass him on the street or pass the time of day with him. I don't know how many times I talked to him. . . . Q. You say, prior to June first you told Mr. McGrath you had promised the cutting to Mr. Long and Mr. Gianella? A. I did. A. M. Gelston recalled for further cross-examination by Mr. Freeman: Q. Mr. Gelston, do you recall an occasion when Mr. McGrath came up to Hamilton and talked to you about the threshing for 1930? A. I presume that he did. I don't recall the particular instance. Q. You don't recall any conversation with Mr. McGrath in which was discussed the question of who was to thresh the grain during the year 1930? A. No further than that I told Mr. McGrath that I had let the contract, and further said, 'Perhaps you had better not do anything more about it until we discuss the matter further.' "

The plaintiff, called as a witness in his own behalf, testified as follows: That during the years 1928, 1929 and 1930 he was contracting for farm work for the defendant, putting in grain and harvesting it; that he harvested grain for the defendant for the years 1928 and 1929; that he had a "Rumley" harvester, a new outfit; that he had an

understanding or agreement with Mr. Gelston, the manager of the defendant, in respect to harvesting the grain for the cropping season of 1930; that in the conversation concerning the harvesting, Gelston stated that he expected the plaintiff and Gianella to do the harvesting for 1930 the same as they did last year; that he had a crew of men, and was prepared to do the harvesting for the defendant; that counting upon the agreement to harvest the crop for the defendant he did not contract for harvesting grain for other parties; that the crop of 1930 was a good crop. This witness also testified as to the approximate cost of cutting the crop; that in June, 1930, he received notice from J. D. McGrath that Gianella was to harvest all the crop. As to the equipment and price this witness testified as follows: ''Q. You never had any discussion at any time with Mr. Gelston about the equipment you were to use? A. I did in 1929. Q. I am talking about 1930? A. Absolutely, Mr. Gelston knew it. He knew I would use the same equipment. . . . Q. Was anything said as to whether you would be paid by the day or by the acre? A. We were to do it the same as we did the year before. Q. How do you know? A. Because Mr. Gelston told me. Q. When? A. I just got through telling you. When we got the bid on the plowing. Q. You also got through telling me you never discussed the price. A. Of course I discussed it sometimes. Q. Did you discuss it in 1929? A. For 1930? Q. Your understanding then was what? A. Three dollars an acre. . . . Q. You didn't discuss price for 1929, you discussed it for 1928, isn't that correct? A. We discussed the price for 1929. Q. You set a a price for 1929? A. Yes, that's what it was. Q. When did you set it? A. I don't remember just when it was, sometime before harvest time. . . . Q. In 1928? A. 1928, when I had the Holt machine, but in 1929 when I had the Rumley, I got $3.00 an acre straight through. . . . Q. You got $3.00 an acre because your machine did the work you thought it would? A. Yes. Q. You didn't make any change in the agreement as to price. That never was discussed again? A. He said the same price. We were to do it at the same price. . . . ''

Henry Gianella, a witness called on behalf of the plaintiff, testified as follows: ''Q. Did you ever have any other conversation with Mr. Gelston at a later time with regard to you

and Mr. Long's cutting this grain? A. Yes. Q. When was that? A. It was along in the spring, early in the spring of 1930. Q. What was said on that occasion? A. Mr. Gelston said that we would have the harvesting contract. Q. Mr. Gelston said you and Mr. Long would have the threshing? A. Yes. . . . Q. What was the price for cutting for the acreage you cut in the year 1930, the acre price? A. You mean the price I received for the cutting? Two dollars and six bits. . . . Mr. Belieu: Was anything said in your presence, either by yourself or Mr. Gelston, prior to the first of June, 1930, with regard to the price per acre for the threshing? A. I was wrong on the price for 1930. I figured $3.00. It was $3.00. Other things in it made it two seventy-five. Q. Were you figuring the old thresher they sold you? A. Yes, that is what I was figuring when I figured that $2.75. . . . Q. He made your getting the entire contract depend upon your taking the old thresher, didn't he? A. Yes. Q. So in reality the harvesting price per acre was $3.00, wasn't it? A. It was, yes."

The record further shows that after the contract was entered into between A. M. Gelston and the plaintiff and Gianella, relative to harvesting the grain, a change in management was made by the defendant, Gelston being superseded by J. D. McGrath; that McGrath entered into negotiations with Gianella, by the terms of which Gianella was to do all the harvesting, and accept as a part of his compensation an old harvester outfit belonging to the defendant valued at the sum of $1,000.

The evidence satisfactorily discloses that the price per acre for which the work was to be performed was understood by all of the contracting parties. The appellant's contention to the contrary overlooks the testimony of the witness Gelston, where the price was specifically mentioned, and of the other witnesses to the effect that the work was to be performed for the same consideration as was paid in 1929, the language of the witness being that "we were to do the work at the same price". ▮ The contention that there was no consideration is fully answered by section 1605 of the Code of Civil Procedure, specifying in effect that a promise, where benefits are to be conferred, constitutes a good consideration. Here, the plaintiff, with a practically new and admittedly efficient threshing outfit, promised to use the

same in harvesting and threshing the grain growing upon the lands and premises belonging to the defendant. It cannot be gainsaid that the harvesting and threshing of the grain would accrue as a benefit to the defendant. On the other hand, the defendant promised and agreed to pay the plaintiff the sum of $3 per acre. The testimony shows that this would be beneficial to the plaintiff in that he would receive compensation for his services in a considerable sum over and above the wear and tear attendant upon his harvesting and threshing outfit, in performing the services and the expense of maintaining an efficient crew in harvesting and threshing the grain for the defendant.

In 6 California Jurisprudence, page 187, section 127, the rule of law relative to a promise as consideration for a promise, supported by numerous authorities, reads as follows: "A promise by one party may be a sufficient consideration for the promise of another, and where there are mutual or reciprocal promises in a written agreement, each constitutes a consideration for the other, particularly where it is expressly so declared." While the contract in this instance is oral, nevertheless there are mutual and reciprocal promises each to the other, and it does not matter whether the appellant could or could not maintain an action for specific performance as against the plaintiff on account of it being an agreement for personal services. The contract is not thereby rendered invalid, for, as said in the case of *Noble* v. *Reid-Avery Co.*, 89 Cal. App. 75 [264 Pac. 341]: "A greater degree or amount of certainty is required in the terms of an agreement which is to be specifically executed in equity than is necessary in a contract which is the basis of an action at law for damages." (Citing *Durst* v. *Jolly*, 35 Cal. App. 184 [169 Pac. 449].)

 We also think that the testimony set forth herein sufficiently shows that each party accepted the terms of the contract and understood all the terms and conditions thereof to be performed by the respective parties. That one who has agreed to perform services for which another has agreed to pay him a certain compensation may bring an action for damages is established by the following cases: *Cederberg* v. *Robison*, 100 Cal. 93 [34 Pac. 625]; *Shoemaker* v. *Acker*, 116 Cal. 239 [49 Pac. 62]; *Rosenberger* v. *Pacific Coast Ry. Co.*, 111 Cal. 313 [43 Pac. 963]. Other

cases might be cited but these sufficiently support what we have stated.

We do not need to follow or review the cases cited by the appellant, for the reason that an examination thereof discloses that in every instance the contract was optional on the part of one of the parties thereto. One case is sufficient as an example of all. Thus, in *Foley* v. *Euless et al.*, 214 Cal. 506 [6 Pac. (2d) 956, 958], the record shows that the plaintiff agreed to handle all the raisins, for a certain year, that the defendants might deliver. The facts set forth in the opinion as reported show that the defendants did not agree to deliver any specified quantity of raisins. Where the contract on the part of one is optional, it follows as a matter of course that the principles set forth in the cases cited by the appellant are controlling, and no judgment for damages can be maintained. Such, however, is not the case here.

The certainty as to the acreage, to all intents and purposes sufficient to maintain an action for damages, is supplied by the exhibits introduced by the defendant. The acreage, as we have stated, for 1929 was approximately 2,400, of which the appellant harvested a trifle more than one-half. The acreage for 1930 was increased to 3,000. The contract was awarded to the same parties who harvested and threshed the grain for 1929, both using the outfits which were used that year.

These facts furnished a basis for the jury in determining damages. The fact that the plaintiff and Gianella were to do the work the same as they had performed it for the year 1929 justified the jury in taking into consideration all the circumstances surrounding the performance of the work in 1929, just as stated in the case of *Dunham-Carrigan & Hayden Co.* v. *Thermoid Rubber Co.*, 84 Cal. App. 669 [258 Pac. 669], where it is said (quoting from the syllabus): ''The making of an agreement may be inferred by proof of conduct as well as by proof of the use of words, and in this action, by a tire jobber against the manufacturer, for breach of a contract to take back tires on hand at the termination of the contract, the evidence justifies the finding of the trial court that the parties had agreed that the life of the agreement, which originally was made for

one year, should be for the succeeding year as well." See, also, authorities cited in the foregoing case on page 673.

No useful service would be rendered by incorporating in this opinion a discussion of the law relative to implied and express contracts. We may say, however, that the testimony set forth herein furnished a sufficient basis for holding that an express contract ·was created and existed in this case. ■ All the promises in this case were made at the same time. One party agreed to do the work; the other party agreed to pay a definite price; both parties knew approximately the number of acres of grain that would be harvested and threshed by the plaintiff. The plaintiff was prepared to do the work. The defendant subsequently breached the contract. The evidence shows that the breach of the contract occurred so late in the season that the plaintiff could not procure other acreage of grain to harvest and thresh. These facts make out a case sufficient to support the verdict. No contention is made that the verdict is excessive.

The judgment is affirmed.

Pullen, P. J., and Thompson (R. L.), J., concurred.